# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

| | | |
|---|---|---|
| BRIAN T. BAXTER AND SUSAN T. KINNIRY | : | No. 76 EM 2024 |
| | : | |
| v. | : | |
| | : | |
| PHILADELPHIA BOARD OF ELECTIONS, REPUBLICAN NATIONAL COMMITTEE, AND REPUBLICAN PARTY OF PENNSYLVANIA | : | |
| | : | |
| PETITION OF: REPUBLICAN NATIONAL COMMITTEE AND REPUBLICAN PARTY OF PENNSYLVANIA | : | |
| BRIAN T. BAXTER AND SUSAN T. KINNIRY | : | No. 77 EM 2024 |
| | : | |
| v. | : | |
| | : | |
| PHILADELPHIA BOARD OF ELECTIONS, REPUBLICAN NATIONAL COMMITTEE, AND REPUBLICAN PARTY OF PENNSYLVANIA | : | |
| | : | |
| PETITION OF: REPUBLICAN NATIONAL COMMITTEE AND REPUBLICAN PARTY OF PENNSYLVANIA | : | |

## CONCURRING STATEMENT

**JUSTICE DOUGHERTY**                               **FILED: November 1, 2024**

"This Court will neither impose nor countenance substantial alterations to existing laws and procedures during the pendency of an ongoing election."[1]  We said those carefully chosen words only weeks ago.  Yet they apparently were not heard in the Commonwealth Court, the very court where the bulk of election litigation unfolds.  Today's order, which I join, rights the ship.  And it sends a loud message to all courts in this Commonwealth: in declaring we would not countenance substantial alterations to existing laws and procedures during the pendency of an ongoing election, we said what we meant and meant what we said.

As I have previously observed, "election litigation has exploded in recent years." *Ball v. Chapman*, 289 A.3d 1, 32 (Pa. 2023) (Dougherty, J., concurring and dissenting). Of particular concern are those cases that seek to change election rules shortly before or during an election.  Regrettably, this election season has seen its fair share of litigants who have sought to do exactly that.  Even more unfortunate, lower courts repeatedly have taken the bait.  Take three examples.

First is *Black Political Empowerment Project v. Schmidt*, 283 MD 2024 ("*BPEP I*"). Nearly two years ago, "[a]s a matter of statutory interpretation of our Election Code," we clarified that the "failure to comply with the date requirement [for absentee and mail-in ballots under 25 P.S. §§3146.6(a) and 3150.16(a)] would render a ballot invalid in any election after 2020."  *Ball*, 289 A.3d at 22.  Unsatisfied with that result, in May of this year the petitioners in *BPEP I* filed in the Commonwealth Court a petition for review challenging the constitutionality of the statutes we interpreted in *Ball*.  They explained that although "the date requirement has [ ] survived previous court challenges, none of the lawsuits thus far have tested the date requirement under" Article, I, Section 5 of the Pennsylvania

---

[1] *New PA Project Educ. Fund v. Schmidt*, 112 MM 2024, 2024 WL 4410884, at *1 (Pa. Oct. 5, 2024) (citation omitted).

Constitution. *BPEP I*, Petition for Review, 5/28/24, at ¶6.[2] Following an expedited litigation schedule, a majority of an *en banc* panel found merit in petitioners' claim and "declared that the Election Code's dating provisions are invalid and unconstitutional as applied to qualified voters who timely submit undated or incorrectly dated absentee and mail-in ballots to their respective county boards[.]" *BPEP I*, 2024 WL 4002321, at *39 (Pa. Cmwlth. Ct. Aug. 30, 2024) (*en banc*) (emphasis omitted).[3] As a result, it "permanently enjoined [respondents] from strictly enforcing the dating provisions of the Election Code[.]" *Id.* (emphasis omitted).[4] In other words, with only 67 days left before

---

[2] Article I, Section 5 provides that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." PA. CONST. art. I, §5.

[3] The petition for review in *BPEP I* was filed on May 28, 2024. A petition for preliminary injunction was filed the next day. Three days after that, in a *per curiam* order, the Commonwealth Court set a conference hearing for June 10, 2024. That unsigned order directed the parties to "be prepared to discuss deadlines for the filing of responsive pleadings, stipulations, [and] the filing and briefing of applications for summary relief," such that oral argument could be held "between July 29 and August 13, 2024." *BPEP I*, Order, 5/31/24, at 1 (*per curiam*). A flurry of intervention requests preceded the conference hearing. Afterwards, the Honorable Ellen Ceisler granted some of those requests and set a tight, unified briefing schedule. In doing so she explained "there are no outstanding questions of fact, nor factual stipulations required, and that . . . disposing of this matter via cross-applications for summary relief was the most expeditious means of resolving the legal issues in dispute." *BPEP I*, Order, 6/10/24, at 2. Judge Ceisler also noted the "[p]etitioners have further agreed" — apparently meaning at her suggestion — "to convert their Application for Special Relief in the Nature of a Preliminary Injunction to an application for summary relief in order to expedite this matter." *Id.* Three days after briefing was completed, oral argument was scheduled for August 1, 2024, before the *en banc* panel. It was reported in the press shortly after argument that the "court said it would . . . issue its opinion as quickly as it can." *See* Paula Reed Ward, *Pa. Appeals Court Hears Arguments About Misdated Mail-in Ballots* (Aug. 1, 2024, 5:48 PM), https://triblive.com/local/regional/pa-appeals-court-hears-arguments-about-misdated-mail-in-ballots/. It did so on August 30, 2024; the divided *en banc* panel filed 150-pages' worth of unpublished opinions, with the majority, in an opinion authored by Judge Ceisler, resolving a novel constitutional issue in petitioners' favor.

[4] The majority "decline[d] to strike Act 77 in its entirety as a consequence of [its] holding[,]" notwithstanding the nonseverability provision included in this bipartisan compromise legislation. *BPEP I*, 2024 WL 4002321, at *38. *See* Act 77 §11 ("Sections 1, 2, 3, 3.2, 4, (continued…)

the 2024 General Election, the *en banc* majority upended the *status quo* that had existed for years in this Commonwealth by enjoining respondents from enforcing the Election Code, leaving us with even less time on direct appeal to determine whether the majority got it right or wrong, either in whole or in part.

After the case arrived on our doorstep, it didn't take long to realize the *en banc* majority, in its rush to resolve the merits, failed to adequately assess whether it possessed subject matter jurisdiction over the case in the first place. So we were left with no choice but to vacate the Commonwealth Court's order for want of jurisdiction. *See Black Political Empowerment Project v. Schmidt*, 68 MAP 2024, 2024 WL 4181592 (Pa. Sept. 13, 2024) (*per curiam*) ("*BPEP II*").[5] Thereafter, the petitioners from *BPEP I*, traveling under an updated case caption following the addition of a new party, inexplicably waited twelve days before asking this Court to credit their own delay and the fact that "time before Election Day [is] growing short" as justification for invoking our sparingly used King's Bench authority to decide the same issue. Application for King's Bench Jurisdiction, 112 MM 2024, 9/25/24, at 3; *see id.* at 31 ("It is critical that the Court exercise its King's Bench power **now**.") (emphasis in original).[6] We declined the request. As noted at the outset,

---

5, 5.1, 6, 7, 8, 9 and 12 of this act are nonseverable. If any provision of this act or its application to any person or circumstances is held invalid, the remaining provisions or applications of this act are void.").

[5] Notwithstanding our unambiguous order indicating the Commonwealth Court lacked subject matter jurisdiction, the lower court subsequently scheduled a conference, *sua sponte*, and directed the parties to "be prepared to discuss advancing further proceedings in this matter on an expedited basis." *BPEP I*, Order, 9/16/24, at 1 (*per curiam*). This prompted respondents to seek further relief from us, which we granted. *See BPEP II*, Order, 9/19/24, at 2-3 (*per curiam*) (directing lower court to "dismiss the matter upon remand in accordance with this Court's September 13, 2024, Order"). The lower court complied with our directive the following day.

[6] Importantly, when *BPEP I* was before us on direct appeal, petitioners did not ask us to exercise King's Bench jurisdiction. They merely suggested that if we had "any remaining doubts as to the original subject matter jurisdiction of the Commonwealth Court" we "can, (continued…)

in doing so we explained "[t]his Court will neither impose nor countenance substantial alterations to existing laws and procedures during the pendency of an ongoing election." *New PA Project*, 2024 WL 4410884, at *1.

Next up was *Republican Nat'l Comm. v. Schmidt*, 108 MM 2024, 2024 WL 4406909 (Pa. Oct. 5, 2024) (*per curiam*), decided the same day as *New PA Project*. As concisely detailed by the Court's *per curiam* order in that matter,

> [i]n September 2022, approximately two months before the General Election, [p]etitioners filed a petition for review in the Commonwealth Court's original jurisdiction against the acting Secretary of the Commonwealth and all sixty-seven County Boards. In that case, as [in their 2024 application for King's Bench jurisdiction], they challenged the implementation of county-level notice and cure procedures for defective absentee and mail-in ballots. Ultimately, the Commonwealth Court dismissed the action, concluding that it lacked jurisdiction over Petitioners' claims. *Republican Nat'l Comm. v. Schmidt* (Pa. Cmwlth., No. 447 M.D. 2022 at 28, filed March 23, 2023) (unreported decision) (concluding that "jurisdiction for an action challenging a [c]ounty [b]oard's development and implementation of notice and cure procedures properly lies in the respective [c]ounty's court of common pleas.").

---

and should, reach the merits of the dispute by exercising . . . extraordinary jurisdiction pursuant to 42 Pa.C.S. §726, because this case presents an issue of immediate public importance." Petitioners' Brief, 68 MAP 2024, at 45. But an exercise of our King's Bench authority is different from an assumption of extraordinary jurisdiction under Section 726. *See In re Bruno*, 101 A.3d 635, 676 (Pa. 2014) ("It bears reiteration that the Court's King's Bench authority and jurisdiction encompass, supplement, and transcend the other powers and jurisdiction enumerated in the 1968 Constitution and the Judicial Code."); *In re Avellino*, 690 A.2d 1138, 1140 (Pa. 1997) ("the two are not identical"). Our power under King's Bench is far broader and affords more flexibility than an exercise of extraordinary jurisdiction. *See Ball*, 289 A.3d at 32 (Dougherty, J., concurring and dissenting) ("normal justiciability concerns simply do not exist when we consider a case under our sweeping King's Bench authority"), *citing, e.g.*, *In re Bruno*, 101 A.3d at 669 ("King's Bench authority is not limited by prescribed forms of procedure . . .; the Court may employ any type of process or procedure necessary for the circumstances."); *see also In re Dauphin Cty. Fourth Investigating Grand Jury*, 943 A.2d 929, 933 n.3 (Pa. 2007) (explaining King's Bench jurisdiction, unlike extraordinary jurisdiction, "allows the Court to exercise power of general superintendency over inferior tribunals even when no matter is pending before a lower court") (internal quotation marks and citation omitted). Litigants would do well to remember the distinctions between the two forms of jurisdiction when asking this Court to exercise one form over the other.

*Id.* at *1 n.1. Rather than raise their claims anew in the proper forum, petitioners in *RNC* did nothing for more than a year and a half. In fact, it was not until September 18, 2024 — more than 18 months after their 2022 suit was dismissed and only 48 days prior to the 2024 General Election — that they filed their application for King's Bench jurisdiction. That was the opposite of due diligence, and we acknowledged this by stating "King's Bench jurisdiction will not be exercised where, as here, the alleged need for timely intervention is created by [p]etitioners' own failure to proceed expeditiously and thus, the need for timely intervention has not been demonstrated." *Id.* at *1. Also important, however, was Justice Brobson's observation in concurrence that "the 2024 General Election is underway" and "[d]eciding these questions at this point would . . . be highly disruptive to county election administration." *Id.* at *2 (Brobson, J., concurring).

Now consider this case. On September 23, 2024, Brian Baxter and Susan Kinniry ("electors"), who "are represented by the same counsel as" the petitioners in *BPEP I* and *New PA Project*, Application for Extraordinary Relief, 10/31/24, at 7, filed in the Philadelphia Court of Common Pleas a petition for review in the nature of a statutory appeal. Electors challenged the decision of the Philadelphia Board of Elections ("Board") to not count their mail-in ballots for an (uncontested) Special Election held on September 17, 2024. Like the petitioners in *BPEP I* and *New PA Project*, electors argued the "Board's decision to refuse to count [their] votes violates art. I, §5 of the Pennsylvania Constitution." Petition for Review, 9/23/24, at ¶8. The trial court agreed following a brief hearing held only two days later. *See* N.T. Hearing, 9/25/24, at 18 ("I do believe [electors] made out a claim for Article I, Section 5 relief under the Pennsylvania Constitution which always prevails over a conflict in the statutory language[.]"); Trial Ct. Order, 9/26/24, at 1 (concluding "the refusal to count a ballot due to a voter's failure to 'date . . . the declaration printed on [the outer] envelope' used to return his/her mail-in ballot, as directed in 26 P.S.

[§]3146.6(A), violates art. I, [§]5 of the Constitution"). Three days after that, the court granted a request to intervene by the Republican National Committee and the Republican Party of Pennsylvania (collectively, "intervenors"), and denied their motion to dismiss electors' petition for relief. The Board then appealed the trial court's decision on October 1, 2024, and intervenors cross-appealed on October 3, 2024.

Recall that we filed our order in *New PA Project* on Saturday, October 5, 2024. The following Monday, October 7th, electors in this case filed in the Commonwealth Court an application to expedite briefing. According to electors, our order in *New PA Project* supposedly "left open the possibility of deciding election cases in [our] 'appellate role with respect to lower court decisions' that arise 'in the ordinary course.'" Application for Expedited Briefing Schedule, 10/7/24, at ¶3 (citation omitted). But electors misleadingly truncated our statement. The full sentence provides as follows: "[W]e will continue to exercise our appellate role with respect to lower court decisions **that have already come before this Court** in the ordinary course." *New PA Project Educ. Fund*, 2024 WL 4410884, at *1 n.2 (emphasis added; citations omitted). The use of past tense in that sentence was neither a coincidence nor unimportant. While we left open the possibility of deciding cases that had already made their way to this Court through the conventional appellate process, this carve-out did not extend to cases pending before the lower courts like this one.

Further, electors argued "[e]xpedited resolution of this matter in advance of the November 5 general election is necessary to guide Philadelphia and other county boards of elections as to the treatment of undated or misdated mail-in and absentee ballots, and to ensure that such ballots are not rejected on unconstitutional grounds." Application for Expedited Briefing Schedule, 10/7/24, at ¶4. Intervenors opposed electors' request for "**additional** expedition on top of the expedited schedule the [c]ourt has already adopted

for these appeals." Intervenors' Opposition to Expedited Briefing, 10/8/24, at 2 (emphasis in original). They explained this Court's October 5th order "could not have been clearer" that we "will not 'countenance' changes to the date requirement during the 2024 General Election." *Id.* at 2-3. Later that day, the Commonwealth Court granted electors' application to expedite in part, ordering the parties to file simultaneous briefs on the merits by October 14, 2024.

Sixteen days after the briefing was completed, and with only six days until the 2024 General Election, a majority of the Commonwealth Court *en banc* affirmed the trial court's order in an unpublished opinion authored by Judge Ceisler. *Baxter v. Philadelphia Bd. of Elections*, 1305 & 1309 CD 2024, 2024 WL 4614689 (Pa. Cmwlth. Ct. Oct. 30, 2024).[7] On the merits, the majority essentially re-adopted its earlier, now-vacated analysis from *BPEP I*. But first it discussed the propriety of deciding the appeal. Notably, the majority rejected intervenors' reliance on *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (*per curiam*). It concluded this Court's citation to *Purcell* in our October 5th order was not "a wholesale adoption of 'the *Purcell* principle' as it relates to Pennsylvania **special** elections, particularly ones that have already happened." *Baxter*, 2024 WL 4614689 at *10 n.23 (emphasis in original); *id.* at *10 ("we do not find that [*Purcell*] foreclose[s] our ability to decide the constitutional issue of first impression presented by these appeals, filed in our **exclusive appellate** jurisdiction, relating to whether certain votes should be counted **in that special election**") (emphasis in original). As support for its position that "this distinguishes *New PA Project* from this case[,]" the panel cited our additional statement in the order that we would "still exercise [our] appellate role with respect to lower court decisions that already came before [us] in the ordinary course." *Id.* at *10 n.23. The

---

[7] President Judge Renée Cohn Jubelirer and Judge Michael H. Wojcik joined the majority opinion.

majority reasoned: "This case too may reach the Supreme Court in the ordinary course." *Id.* Of course, like electors, *see supra*, the majority swept over the critical caveat that such cases must "**have already come before this Court** in the ordinary course." *New PA Project*, 2024 WL 4410884, at *1 n.2 (emphasis added). Moreover, with respect to our declaration that we will not "countenance substantial alterations to existing laws and procedures during the pendency of an ongoing election," the majority reiterated it was only resolving a direct appeal from a special election that had already occurred, and it was "**not** being asked to make changes with respect to the impending General Election[.]" *Baxter*, 2024 WL 4614689 at *10 (emphasis in original).

Two judges dissented. Judge Patricia A. McCullough forcefully argued the majority "once again has unnecessarily hurried to change the mail-in voting rules in Pennsylvania, this time mere days before the consummation of a hotly contested general election." *Id.* at *19 (McCullough, J., dissenting). She explained this Court's pronouncements in *New PA Project*

> straightforwardly apply in this case to preclude the Majority's hasty ruling. The Majority today affords the exact relief that the Supreme Court refused to consider or afford in *New PA Project* precisely because it changes the rules in the middle of a general election. Not only does the Majority's decision change how election boards will count mail ballots with undated or misdated declarations, but it also changes the voting rules after thousands, if not millions, of mail ballots already have been completed and cast by Pennsylvania voters. Many, if not all, counties have procedures in place to notify mail voters if their declarations are undated or misdated and afford them the ability to either request a new mail ballot or vote by provisional ballot. *See Genser*[ *v. Butler Cty. Bd. of Elections*, ___ A.3d ___, 2024 WL 4553285 (Pa. Oct. 23, 2024)]; *Center for Coalfield Justice v. Washington County Board of Elections* (Pa. Cmwlth., No. 1172 C.D. 2024, filed September 24, 2023). What happens to the ballots already cast with undated or misdated declarations? Are they now valid? What do county boards of elections do with replacement mail ballots that have been cast with corrected or filled-in declaration dates? Are the replacement ballots counted, are the original, defective ballots counted, or both? And what about the voters who, due to the defects in the declarations on their mail ballots, have now elected to go to their polling place on election day and

cast a provisional ballot, which they now unquestionably may do under the Election Code. *See Genser.* May they do that? Must they do that? Will their prior, defective ballots now be counted?

*Id.* at *21.

Judge Wolf's dissent was similar. He explained the majority's decision was "ill-timed, proceed[ed] on an unnecessarily expedited track, has the potential to confuse the electorate, and deprives the Pennsylvania Supreme Court of a **reasonable** opportunity to review[.]" *Id.* at *24 (Wolf, J., dissenting) (emphasis in original). He faulted the majority for ignoring our "crystal-clear directive" in *New PA Project* by "handing down a sweeping constitutional decision disposing of an issue of first impression to settle the counting of votes that will not impact the outcome of a past special election, but which will cause a significant sea change in the election processes effectuated by the county boards." *Id.* at *26. He also noted his concern

> with how [the majority]'s decision may influence voter behavior. On October 23, 2024, the Supreme Court handed down a decision in *Genser* . . ., making clear that certain errors which result in mail-in and absentee ballots being voided may be addressed by provisional voting. Voters and election officials are bound by *Genser.* But now, th[e majority]'s last-minute decision calls into question voters' need to vote by provisional ballot if they suspect an issue with the date on their mail-in or absentee ballot. When word of the "*Baxter* decision" gets out, it may lead an elector or election official to believe that an undated or incorrectly dated ballot will be counted despite its defect, counseling away from appearing on election day to vote provisionally. And this may stand true. But this [c]ourt, an intermediate appellate court, will most likely not be the last to speak on the issue, and the timing of this intermediate appellate [c]ourt's decision puts the Pennsylvania Supreme Court in a near-impossible position.

*Id.* Indeed, Judge Wolf observed "[o]ne need not look any further than the facts of this case to see how" the majority's decision could impact voter behavior:

> Designated Appellee Kinniry additionally attested to the fact that she received an email from the County Board on August 27, 2024, informing her that her vote would not be counted if she did not take additional steps to fix her omission of the date. However, she did not attempt to fix her mail-in ballot because she read the news about this [c]ourt's decision in [*BPEP I*)], in which this [c]ourt held that it is unconstitutional for county boards of

> elections to reject mail ballots for noncompliance with the Election Code's
> dating provisions.

*Id.*, *quoting id.* at *3 (majority opinion). In sum, Judge Wolf believed the majority's opinion "will undoubtedly influence the behavior of voters and election officials across the Commonwealth [in the 2024 General Election] and will do so in a timeframe that all but forecloses further appellate review from our High Court." *Id.*

Today, this Court stays the *en banc* majority's decision pending the timely filing and subsequent disposition of a petition for allowance of appeal by intervenors. Although the Court's *per curiam* order does not directly invoke our order in *New PA Project*, that earlier ruling plainly undergirds the decision at least in part and certainly motivates my joinder herein. Indeed, it cannot be denied that the majority below issued a disruptive holding that, in effect, changes the game from the prevailing *status quo* on the very eve of the election, long after mail ballots have been shipped and returned, and guidance has been issued to voters, boards of elections, and election workers concerning the handling of undated and misdated ballots.

There are several lessons to be drawn from our resolution of these three cases over the past month. First, the simple fact that a litigant has identified a significant and colorable legal issue that has potential to impact an upcoming election does not mean courts should suspend the normal and orderly administration of the judicial process to fully resolve it prior to the election. *See e.g.*, *Kelly v. Commonwealth*, 240 A.3d 1255, 1263 (Pa. 2020) (Saylor, C.J., concurring and dissenting) ("I believe that, to the extent possible, we should apply more ordinary and orderly methods of judicial consideration, since far too much nuance is lost by treating every election matter as exigent and worthy of this Court's immediate resolution."). Sometimes, an election lawsuit is just filed too late to be resolved in a proper and timely manner. In that situation, there may be no choice other than to apply any resulting decision prospectively. Or, where jurisdiction is

discretionary, it may mean denying review altogether and awaiting a more suitable vehicle to address the matter in the future. That was the case in *New PA Project* and *RNC*. Litigants should recognize the serious risk they take by waiting too long to file an election-related lawsuit, or by filing it too close to an election.

Second, it is important to recognize timing is not the only factor at play. The other primary consideration is whether granting the requested relief would lead to substantial alterations to existing laws and procedures during the pendency of an ongoing election. *See Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) ("Call it what you will — laches, the *Purcell* principle, or common sense — the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so.").[8] The petitioners in *New PA Project* and *RNC* both sought to have us do exactly that via King's Bench, even though mail-in voting had already started. The Court recognized as much and rightly declined both invitations. Likewise here, the *en banc* majority's opinion runs a very real risk of disturbing the rapidly approaching General Election, as detailed by Judges McCullough and Wolf in their dissents. That reality is perhaps best captured by a headline appearing in Pennsylvania's largest newspaper only hours after the majority issued its decision: "A

---

[8] The rule in the federal system is that "federal courts ordinarily should not enjoin a state's election laws in the period close to an election," and the United States Supreme Court "has often stayed lower federal court injunctions that contravened that principle." *Merrill v. Milligan*, 142 S.Ct. 879, 880 (2022) (Kavanaugh, J., concurring). "That principle — known as the *Purcell* principle [because it derives from *Purcell v. Gonzalez, supra*] — reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Id.* at 880-81. To the extent the majority below endeavored to explain why *Purcell* does not control here, it missed the mark. Our order did not purport to rigidly adopt the *Purcell* principle on its own terms, whatever those may be. We instead quoted Judge Sutton's line from *Crookston*, which persuasively explains that it doesn't matter whether you call it the *Purcell* principle, laches, or common sense — the fundamental concept is that courts should "not disrupt imminent elections absent a powerful reason for doing so." 841 F.3d at 398.

new ruling on undated ballots in Pennsylvania has injected confusion and uncertainty into the final days of 2024 campaign."[9]

This leads to my third and last point. Although this Court has yet to settle on the precise contours of the important principle endorsed by our October 5th order in *New PA Project*, the takeaway is that courts in this Commonwealth should henceforth refrain from granting relief in election cases where it would result in "substantial alterations to existing laws and procedures during the pendency of an ongoing election." *New PA Project*, 2024 WL 4410884, at *1. Admittedly, a "substantial alteration" is a somewhat nebulous term at present; and given the realities of mail-in and absentee voting, there may be some grey area in precisely defining "the pendency of an ongoing election." Nevertheless, until this Court provides more specific guidance in those regards, lower courts would be wise to err on the side of caution. If granting relief to a party would upend the *status quo* and there likely will be insufficient time for the case to fully work itself through the normal appellate process (including in this Court) before the election, the best practice is to stay the ruling pending appeal.[10] This limits the potential for chaos and uncertainty and allows time for this Court to adequately assess whether the decision below should remain stayed

---

[9]      https://www.inquirer.com/politics/election/undated-ballots-pennsylvania-ruling-commonwealth-court-20241030.html

[10] The "normal appellate process" certainly does not include deciding a case six days before an election and then "urg[ing] the parties to proceed expeditiously should they wish to appeal" to this Court. *Baxter*, 2024 WL 4614689, at *6 n.16. Obviously, the parties here were destined to appeal any adverse ruling, and there's never been any doubt that this Court will have the final say on this issue. So what exactly did the *en banc* majority expect us to do with the five days left between the filing of intervenors' appeal and the 2024 General Election? Surely they did not seriously expect us, in such a short period, to devote proper attention and resources to resolve the novel constitutional issue involved, nor could they have reasonably believed that such rushed consideration of this highly important question was in any way advisable.

until this Court has a chance to address the merits of the case, or whether it is otherwise appropriate to put it into immediate effect.

In closing, I join the Court's *per curiam* order because the majority below plainly violated the spirit, if not the letter, of the eminently sensible and long-overdue principle endorsed in *New PA Project*.  To reiterate the point once more: we said what we meant, and we meant what we said.  Moving forward, lower courts should think twice — maybe even three times — before granting relief that could arguably be construed as imposing "substantial alterations to existing laws and procedures during the pendency of an ongoing election."  *New PA Project Educ. Fund*, 2024 WL 4410884, at *1.[11]

---

[11] I recognize this Court's order in *New PA Project* technically is a non-binding *per curiam* order.  I respectfully suggest it may be appropriate for this Court at some future point to invoke our King's Bench authority — *sua sponte* or otherwise — to more firmly establish the principles espoused in that order, thereby providing clarity to all lower courts in this Commonwealth regarding how they should approach future election cases.